tion from which the train was to approach. He saw other people coming out from the station ostensibly for the purpose of taking the train. His friends with whom he was talking asked where he left his baggage and started to get theirs, he following. According to his own testimony, he had every reason to believe that the train was approaching this station, and he acknowledges that he saw the helper engine; and yet he tells us that he not only did not look, which he could have done easily, for the purpose of ascertaining whether or not the train was approaching, but deliberately and with his back turned in the direction from which he knew the train was coming, and when he was advancing up the platform to get his baggage, stepped to the outer edge of the platform to pass around a woman who was standing in the way, and was struck in the left side and injured. The contributory negligence of the plaintiff is so apparent as to bar a recovery in this action. White v. N. Y. C. & H. R. R. Co., 68 App. Div. 561, 73 N. Y. Supp. 827, affirmed 174 N. Y. 543, 67 N. E. 1091, without opinion; Pennsylvania R. Co. v. Bell, 122 Pa. 58, 15 Atl. 561; Matthews v. Penn. R. Co., 148 Pa. 491, 24 Atl. 67; Young v. N. Y., L. E. & W. R. Co., 107 N. Y. 500, 14 N. E. 434; Woodard v. N. Y., L. E. & W. R. Co., 106 N. Y. 369, 13 N. E. 424; Hagglund v. Erie R. R. Co., 210 N. Y. 46, 103 N. E. 770.

The motion for a new trial is granted, with costs to the defendant to abide the event.

Motion granted, with costs to abide event.

===

## METROPOLITAN OPERA CO. v. HAMMERSTEIN et al.

(Supreme Court, Appellate Division, First Department. April 17, 1914.)

1. MONOPOLIES (§ 10*)—INTERSTATE COMMERCE—SHERMAN ACT.
    The Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) against unlawful restraints and monopolies applies only to interstate commerce or covenants and agreements affecting interstate commerce.

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 9; Dec. Dig. § 10.*]

2. MONOPOLIES (§ 12*)—COMBINATIONS PROHIBITED—OPERA—"TRADE"—"COMMERCE."
    "Trade" is the act or business of barter and the buying and selling of commodities, while "commerce" is an exchange of merchandise on a large scale between different places or communities, and is applicable generally to commercial intercourse between nations or states, and hence the business of producing grand opera does not, in its essentials, fall within the scope of the terms "trade" or "commerce," and restrictive covenants tending to give a monopoly of the production of grand opera are not within the Sherman Act.

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

    For other definitions, see Words and Phrases, vol. 8, pp. 7037–7041, 7818; vol. 2, pp. 1287–1298; vol. 8, pp. 7606, 7607.]

3. MONOPOLIES (§ 12*)—OPERA—INTERSTATE COMMERCE—SHERMAN LAW.
    A restrictive covenant tending to give a monopoly of the production of grand opera in different localities is not within the Sherman Act, because

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the operas might be given in various states, and thus interstate transactions might arise; such transactions being wholly incidental.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

4. THEATERS AND SHOWS (§ ½ New, vol. 13 Key-No. Series)—OPERA CORPORATIONS—POWERS.

A corporation formed for the production of grand opera has power, upon acquiring the business, to purchase the good will of another producer of grand opera, and to bind him by restrictive covenants not to engage in competition.

5. CONTRACTS (§ 117*)—LEGALITY—RESTRAINT OF TRADE.

Where a business is sold with the good will, a covenant restraining the seller from re-engaging in the business, when partial and only coextensive with the good will sold, is valid and enforceable in equity.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 554–569; Dec. Dig. § 117.*]

6. CONTRACTS (§ 117*)—LEGALITY—RESTRAINT OF TRADE—PARTIES.

Where an employé of a producer of grand opera joined in a covenant which restricted the producer upon a sale of his property and good will from engaging in competition with his purchaser, the covenant is binding upon the employé, for the producer might have made such a covenant with his employé and by assignment passed it to the buyer.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 554–569; Dec. Dig. § 117.*]

Appeal from Special Term, New York County.

Action by the Metropolitan Opera Company against Oscar Hammerstein and another. From a judgment for plaintiff on the pleadings, defendants appeal. Affirmed.

The opinion of Pendleton, J., referred to, is as follows:

This is a motion by plaintiff for judgment on the pleadings against both the defendants, and proceeds on the contention that the denials of the complaint are directed against immaterial matters only, and that the separate defenses alleged in the answers do not state facts sufficient on their face to constitute a defense. The action is in the nature of an action in equity for specific performance, and is brought to enjoin the defendants from producing grand opera in the city of New York in violation of a covenant not to give grand opera in the city of New York or Boston within a period of ten years from the date of the contract. The covenant in question forms part and parcel of a contract or contracts whereby the defendant Oscar Hammerstein sold his certain properties, business, and good will in connection with the giving of grand opera. That courts of equity will by injunction enforce restrictive covenants given as an incident to the sale of property, business and good will within proper limitations as hereinafter pointed out, is too well settled to require the citation of authorities in its support. The complaint adequately sets forth the contract of sale and the covenants sought to be enforced. The defendants answered separately.

[1-3] Each sets up as a separate defense: First, that the contract in question was violative of the provisions of the statute of the United States entitled "An act to protect trade and commerce against unlawful restraints and monopolies," known as the Sherman Act; and, second, that the contracts as to the plaintiff corporation were ultra vires. The defendant Arthur Hammerstein sets up an additional defense applicable to him alone, whereby he alleges that at the time of the contract he had no interest in the property or business sold and was only an employé of the other defendant. The act of Congress referred to has reference only to trade or commerce among the several states or with foreign nations, and it is only covenants and agreements which are in their direct effect in restraint of such trade or commerce that come within the provisions of the act. It is essential, therefore, to have a case

---

under this act that the covenant or agreement in question be in its direct effect in restraint of trade or commerce and that such trade or commerce be trade or commerce among the several states or with foreign nations. The distinction is fundamental and often pointed out, as will hereafter be more fully shown, between contracts which directly affect interstate commerce and those the effect of which on interstate commerce is only incidental, secondary and remote. In the latter class of cases the authorities are clear that such incidental or secondary effect does not bring the contract within the purview of the statute. It is alleged in the pleadings that on or about the time of the execution of the covenants and agreements in question plaintiff and defendant Oscar Hammerstein were engaged in the production of grand opera in the city of New York and to a limited extent in other cities. The covenants sought to be enforced relate directly only to the production of grand opera, and if in their direct effect are in restraint of anything, it must be as to that. At the very threshhold of the inquiry is, therefore, the question, whether such production is trade or commerce. Is the business of producing grand opera, in its essential characteristics, trade or commerce?

Webster defines "trade" as "the act or business of exchanging commodities by barter; the business of buying and selling for money; commerce; traffic; barter." "Commerce" is defined as "the exchange of merchandise on a large scale between different places or communities; extended trade or traffic." The Standard Dictionary defines "commerce" as "the exchange of goods, productions of property of any kind, especially on a large scale, as between states or nations." Jacobs' Law Dictionary says trade and commerce are not synonymous. Commerce relates to dealings between foreign nations; trade means mutual traffic among ourselves, or the buying, selling, and exchange of articles between members of the same community.

In Gibbons v. Ogden, 9 Wheat. 189, 6 L. Ed. 23, Chief Justice Marshall said: "Commerce undoubtedly is traffic, but it is something more; it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

It is evident the intercourse referred to is commercial intercourse.

In Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346, Mr. Justice Lamar says: "No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation."

In United States v. Knight, 156 U. S. 13, 15 Sup. Ct. 249, 39 L. Ed. 325, the court says: "The regulation of commerce applies to the subjects of commerce."

In United States v. Swift & Co. (C. C.) 122 Fed. 531, the court says: "Commerce, briefly stated, is the sale or exchange of commodities."

In N. Y. Life Ins. Co. v. Cravens, 178 U. S. 389, 20 Sup. Ct. 962, it was held that the business of insurance is not commerce; the contract of insurance is not an instrumentality of commerce; the making of the contract is a mere incident of commercial intercourse, and the court very pertinently called attention to the statement in Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297, that the contrary contention "involves an erroneous conception of what constitutes interstate commerce."

In Re Oriental Soc'y (D. C.) 104 Fed. 975, it was held a corporation incorporated for the purpose of giving theatrical representations was not "trading or following mercantile pursuits."

In Re Duff (D. C.) 4 Fed. 519, a theatrical manager was held not to be a merchant or tradesman.

In People v. Klaw, 55 Misc. Rep. 72, 106 N. Y. Supp. 341, it was held that plays and entertainments of the stage are not articles and commodities and that the business of owning, controlling, and leasing theaters and producing plays or entertainments of the stage is not commerce.

The production of opera or other theatrical exhibitions before an audience

in exchange for the price of the tickets involves none of the elements of trade or commerce as commonly understood. There is no dealing with an article of trade or commerce nor any use made of any of the instrumentalities of commerce. The holder of the ticket pays a certain price as a consideration for the privilege of experiencing the gratification of an artistic sense. Such a transaction is as far removed as possible from the commonly accepted meaning of trade or commerce. If the production of opera is trade or commerce, it would seem to follow that every museum which exhibits pictures, every university which gives courses of instruction or lectures, every lawyer who prepares a brief, every surgeon who performs an operation, every circus, moving picture show, exhibiting pugilist, actor, or performer is engaged in commerce. In the construction of statutes the usual and natural meaning is to be given to words, and it can scarcely be urged that a construction which would include the above in "trade or commerce" would give to the words their usual and natural meaning. If the production of opera is not commerce, the fact of its production, sometimes at one place and sometimes at another, does not make it so. If, then, the thing or matter directly affected by the covenants in question is not commerce, the fact that incidentally in preparation for, or to enable it to give, the production, plaintiff does some acts or enters into transactions of interstate commerce and uses the instrumentalities of interstate transportation, and to that extent is at times engaged in interstate commerce, does not bring these covenants within the provisions of the act of Congress, for the reason that they do not relate to such acts or activities and the latter are not directly affected thereby. The effect thereon, if there be any, is only incidental, secondary, and remote. Such acts and activities are neither an essential part of the production of opera nor a necessary incident thereto. Plaintiff might produce opera in different cities without engaging in any of such acts or activities; if he does, it is an entirely collateral matter, and a covenant relating to giving grand opera can have no direct effect upon transactions forming no necessary part thereof and which it is optional with plaintiff or any one producing grand opera to enter into or not. The fact, if it be a fact, that as a result of this contract the amount of transportation from one state to another might be curtailed or other acts of interstate commerce be in similar indirect manner affected does not bring this contract within the Sherman Act. Such effect is incidental only and secondary.

In Cincinnati, Portsmouth, Big Sandy & Pomeroy Packet Co. v. Bay, 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428, the court says: "It does not appear * * * that the contract necessarily contemplated commerce between the states. * * * We will suppose then that the contract does not leave commerce among the states untouched. But even on this supposition it is manifest that interference with such commerce is insignificant and incidental, and not the dominant purpose of the contract, if it actually was thought of at all." In that case the contract related to the purchase of boats used to transfer freight and passengers between intrastate points, and provided that the seller should not for a certain period be engaged in operating boats between such points. It was held that the mere fact that the boats operating on a boundary river between states sail over some portion of the soil belonging to another state while passing between the intrastate ports did not make the contract one affecting interstate commerce, and in that connection the court used the language above quoted. To hold every covenant or contract which, however remotely or incidentally, might affect some branch of interstate commerce or the instrumentalities thereof within the statute would be to extend the application of the act in a manner entirely unauthorized by the authorities. In fact, it would seem to be difficult to find any contract which might not in some degree or indirect manner have such result. The decisions are numerous that where the business or thing directly affected by the contracts are not matters of interstate commerce the mere fact that incidentally in preparation for or as a result of, or in some other collateral or incidental manner, acts or transactions of an interstate commercial character take place does not bring the case within the purview of the act.

In Engel v. O'Malley, 219 U. S. 128, 31 Sup. Ct. 190, 55 L. Ed. 128, it was held that the fact that money deposited in private banks is likely to be trans-

mitted out of the state did not make the deposit interstate commerce, and that therefore a state act regulating the receiving of deposits by private banks was not obnoxious to the commerce provision of the United States Constitution. The deposit was held to be an independent transaction preceding the transmission.

And in Diamond Glue Co. v. U. S. Glue Co., 187 U. S. 611, 23 Sup. Ct. 206, 47 L. Ed. 328, it was held that manufacturing within the state was not interstate commerce because incidentally the manufactured article was to be shipped out of the state for sale.

Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. 128, 45 L. Ed. 186, held that the hiring of laborers in Georgia was not interstate commerce, although they were to be employed without the state and transportation interstate must eventually take place. The court points out the distinction between interstate commerce and the instrumentalities thereof and matters which are merely incidents and no part of such commerce.

In Hopkins v. United States, 171 U. S. 573, 19 Sup. Ct. 40, 43 L. Ed. 290, the court says: "We come therefore to the inquiry as to the nature of the business or occupation that the defendants are engaged in. Is it interstate commerce in the sense of that word as it has been used and understood in the decisions of this court? Or is it a business which is an aid or facility to commerce, and which, if it affect interstate commerce at all, does so only in an indirect and incidental manner? * * * The business of the defendants is primarily and substantially the buying and selling, in their character as commission merchants, at the stockyards in Kansas City, live stock which has been consigned to some of them for the purpose of sale, and the rendering of an account of the proceeds arising therefrom. The sale or purchase of live stock as commission merchants at Kansas City is the business done, and its character is not altered because the larger proportion of the purchases and sales may be of live stock sent into the state from other states or from the territories. Where the stock came from, or where it may ultimately go after a sale or purchase, procured through the services of one of the defendants at the Kansas City stockyards, is not the substantial factor in the case. The character of the business of the defendants must, in this case, be determined by the facts occurring at that city. * * * Notwithstanding these various matters undertaken by defendants, we must keep our attention upon the real business transacted by them, and in regard to which the section of the by-law complained of is made. * * * To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased, would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce in order to come within the act. * * * Many agreements suggest themselves which relate only to facilities furnished commerce, or else touch it only in an indirect way, while possibly enhancing the cost of transacting the business, and which at the same time we would not think of as agreements in restraint of interstate trade or commerce. They are agreements which in their effect operate in furtherance and in aid of commerce by providing for it facilities, conveniences, privileges, or services, but which do not directly relate to charges for its transportation, nor to any other form of interstate commerce. To hold all such agreements void would in our judgment improperly extend the act to matters which are not of an interstate commercial nature."

In United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, it was held that trade or commerce might be indirectly affected was not enough. The distinction between agreements which directly affect interstate commerce and those the effect of which on interstate commerce is only secondary and remote was clearly pointed out by the court in Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, where the agreement or combination was held to relate to interstate sales and therefore directly affect interstate commerce. The court, referring to the Knight Case, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, above cited, says: "Therefore, the case is not like United States v. E. C. Knight Co., 156 U. S. 1 [15 Sup. Ct. 249, 39 L. Ed. 325], where the subject-matter of the combination was manufacture and the direct object monopoly of manufacture within a state. However like-

ly monopoly of commerce among the states in the article manufactured was to follow from the agreement, it was not a necessary consequence nor a primary end. Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect of such sales. The two cases are near to each other, as sooner or later always must happen where lines are to be drawn, but the line between them is distinct." The cases relied on by defendants are not at all in point. They have all special features not present here.

In Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905, it was held that an act of Congress regulating the interstate transportation of persons was within the grant of power to regulate commerce among the several states. The court says: "What the act condemns is transportation obtained or aided or transportation induced in interstate commerce for the immoral purposes mentioned." Transportation between the states is concededly an act in interstate commerce, and it was to such act that the statute in question was directed. It requires no argument to show that that case is not an authority on the question here presented. Congress may well have the power to legislate as to the manner or purpose of transporting from one state to the other theatrical scenery, properties, or the company itself, or make regulations as to such transportation. The existence of such power has no bearing on the question now involved. The Lottery Case, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492, is distinguishable on similar grounds. The act of Congress in question related to the carriage of articles between the states. Hipolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364, was legislation regulating interstate traffic. In United States v. Pacific & Arctic Co., 228 U. S. 87, 33 Sup. Ct. 443, 57 L. Ed. 742, the combination was between carriers as to transportation partly within and partly without the United States. In International Text Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103, the gist of the business was the continuous interstate exchange of books, apparatus, and papers and correspondence through the mails under contract between plaintiff and its various scholars and agents. The facts in that case, as pointed out by the court, presented an exceptional condition which deprives it of any real application to the questions here discussed.

[4] As to the defense that the contract was ultra vires as to plaintiff, it appears that plaintiff is a corporation organized to give theatrical representations and operas and own all the properties necessary or incident thereto. It is difficult to see why, if the acquisition of plays, opera, or theatrical houses, theatrical costumes, and other properties incident to theatrical productions is within its corporate power, the purchase of the good will of an operatic or theatrical business, which must be a most valuable asset in carrying out the purposes for which it was incorporated, should not be. If the purchase of defendants' business and good will was within its corporate powers, certainly the covenants necessary for and incident to the protection and securing to it of such good will were equally within its corporate rights.

[5, 6] The separate answer of the defendant Arthur Hammerstein raises an entirely different question, and one applicable to him alone, viz., that, being an employé and not a part owner of the property sold, his covenant is void at common law as illegally in restraint of trade. That a court of equity will by injunction enforce the performance of restrictive covenants, where such are given as an incident to the sale of property and business and its good will, is well established; such covenants are necessary to give value to and are an incident of the sale of the business and good will, and when partial and only coextensive with the good will sold are legal, valid, and enforceable in a court of equity. Where the restraint imposed by the covenant is no greater than reasonably required for the protection of the legitimate interests of the vendee, and therefore incident to the main purpose, to wit, the sale and purchase, the covenants are not invalid as in restraint of trade; they are, on the contrary, conducive to the freedom of trade and right to sell.

In Diamond Match Co. v. Roeber, 106 N. Y. 482, 13 N. E. 421, 60 Am. Rep. 464, the court cites with approval the rule that the true test is "whether the restraint is such only as to afford a fair protection to the interests of the

party in favor of whom it is given, and not so large as to interfere with the interests of the public. * * * It is an encouragement to industry and to enterprise in building up a trade that a man shall be allowed to sell the good will of the business and the fruits of his industry upon the best.terms he can obtain."

The rule and the reasons for it were clearly stated in the case of the United States v. Addyston Pipe & Steel Co., 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 122, affirmed in the United States Supreme Court 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136. The opinion in the Circuit Court was as follows: "The inhibition against restraints of trade at common law seems at first to have had no exception. See language of Justice Hull, Year Book, 2 Hen. V, folio 5, pl. 26. After a time it became apparent to the people and the courts that it was in the interest of trade that certain covenants in restraint of trade should be enforced. It was of importance, as an incentive to industry and honest dealing in trade, that, after a man had built up a business with an extensive good will, he should be able to sell his business and good will to the best advantage, and he could not do so unless he could bind himself by an enforceable contract not to engage in the same business in such a way as to prevent injury to that which he was about to sell. It was equally for the good of the public and trade, when partners dissolved and one took the business, or they divided the business, that each partner might bind himself not to do anything in trade thereafter which would derogate from his grant of the interest conveyed to his former partner. Again, when two men became partners in a business, although their union might reduce competition, this effect was only an incident to the main purpose of a union of their capital, enterprise, and energy to carry on a successful business, and one useful to the community. Restrictions in the articles of partnership upon the business activity of the members, with a view of securing their entire effort in the common enterprise, were, of course, only ancillary to the main end of the union, and were to be encouraged. Again, when one in business sold property with which the buyer might set up a rival business, it was certainly reasonable that the seller should be able to restrain the buyer from doing him an injury which, but for the sale, the buyer would be unable to inflict. This was not reducing competition, but was only securing the seller against an increase of competition of his own creating. Such an exception was necessary to promote the free purchase and sale of property. Again, it was of importance that business men and professional men should have every motive to employ the ablest assistants, and to instruct them thoroughly; but they would naturally be reluctant to do so unless such assistants were able to bind themselves not to set up a rival business in the vicinity after learning the details and secrets of the business of their employers. * * * It would be stating it too strongly to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party."

In Dr. Miles Medical Co. v. John D. Parks, 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, the rule is thus stated: "With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions. But the public interest is still the first consideration. To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties, and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee. Otherwise restraints of trade are void as against public policy."

The opinion in United States v. Addyston Pipe & Steel Co. quotes, with apparent approval, Baron Parke as follows: "Contracts for the partial restraint of trade are upheld, not because they are advantageous to the individual with whom the contract is made, and a sacrifice pro tanto of the rights of the community, but because it is for the benefit of the public at

large that they should be enforced.   Many of these partial restraints on trade are perfectly consistent with public convenience and the general interest, and have been supported.   Such is the case of the disposing of a shop in a particular place, with a contract on the part of the vendor not to carry on a trade in the same place.   It is, in effect, the sale of a good will, and offers an encouragement to trade by allowing a party to dispose of all the fruits of his industry.   *   *   *   And such is the class of cases of much more frequent occurrence, and to which this present case belongs, of a tradesman, manufacturer, or professional man taking a servant or clerk into his service, with a contract that he will not carry on the same trade or profession within certain limits.   *   *   *   In such a case the public derives an advantage in the unrestrained choice which such a stipulation gives to the employer of able assistants, and the security it affords that the master will not withhold from the servant instruction in the secrets of his trade, and the communication of his own skill and experience, from the fear of his afterwards having a rival in the same business."

If a contract by an employé with his employer not to enter into the same business or compete is not illegally in restraint of trade for the reasons above given, in order to sell his business and good will protected by such a covenant the employer must have the right to transfer to his vendee the benefit and protection of such covenant.   If the right of enforcing such a covenant can be vested in the vendee by assignment, it is difficult to see why the same covenant made by the employé directly with the vendee, as an incident of the sale, is an illegal restraint of trade.   It accomplishes directly what concededly might be accomplished indirectly, and if the contract of the employé with the employer is not illegally in restraint of trade, the same contract with the vendee of the employer, made as an incident to and part of the contract of sale where the restraint is no greater than required by the legitimate interest of the vendee, is equally not illegally in restraint of trade.

The opinion in United States v. Addyston Pipe & Steel Company, above cited, is not so much an enumeration of the special cases where covenants of the character referred to are deemed valid as a statement of the principle of the rule and the reasons therefor, as is shown by the last clause above quoted of such opinion, and that principle is that, where the covenants are an incident of the sale and made only as a reasonable provision for the protection of the vendee, they are valid for the reason that they are not really in restraint, but are, on the contrary, in the interest of freedom of trade, as they tend to permit that to be sold and disposed of which, without the protection of such covenants, might not be.   Davis v. Booth & Co., 113 Fed. 31, 65 C. C. A. 269, Nat. Gum & Mica Co. v. Braendly, 27 App. Div. 219, 51 N. Y. Supp. 93, and Anchor Elec. Co. v. Hawkes, 171 Mass. 101, 50 N. E. 509, 41 L. R. A. 189, 68 Am. St. Rep. 403, are cases where such covenants by third parties have been sustained, and although they have some features not present here they illustrate the right that the test is whether the covenants are made as reasonably necessary for the protection of the vendee.   The contracts specifically state the objects of and purposes of the parties in having defendant Arthur Hammerstein join in the covenants.

The allegations of the answer are largely allegations of conclusions rather than facts.   I think plaintiff is entitled to judgment.   In view of the above conclusions it is needless to consider the other questions discussed on the argument.

Motion for judgment for plaintiff granted, with leave to defendants to amend their answers within 20 days on payment of costs before notice of trial and costs of this motion.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and HOTCHKISS, JJ.

. P. D. Cravath, of New York City, for appellants.

H. A. Wise and J. B. Stanchfield, both of New York City, for respondent.

PER CURIAM.   Judgment and orders affirmed, with costs on opinion of Pendleton, J.   Order filed.